Good morning, Your Honors. May it please the Court, Jeff Sandberg for the Office of the United States Trustee. With the Court's permission, I'd like to reserve four minutes for rebuttal. You got it. This case is about Congress's funding of federal bankruptcy administration. The U.S. Trustee Program, which is part of the Executive Branch, operates in the vast majority of federal judicial districts, 88 districts. A parallel Bankruptcy Administrator Program, housed in the Judicial Branch, performs the same functions in the remaining six districts in Alabama and North Carolina. Both programs are ultimately funded by, not by taxpayers, but by user fees that are paid by bankruptcy debtors with pending Chapter 11 cases. The key issue before this Court in this case is what, if any, further remedy is required for the defect found by the Supreme Court last term in Siegel v. Fitzgerald relating to a discrepancy in fees actually collected as between the U.S. Trustee and Bankruptcy Administrator District starting in January 2018. I had an initial framing question for you. So in your brief, you kind of make two points. One, you talk about whether the legislation applies to pending cases. And then you talk about what's the remedy if, because the Supreme Court found the law unconstitutional. I'm not sure, and help me out here. It seems to me if the law is unconstitutional, what the Supreme Court has decided that it is, why do we need to be concerned with whether it applies to pending cases or not if the law is unconstitutional? Your Honor, the District Court here ruled against us on two independent grounds, and so we need to obtain reversal from this Court on both grounds in order for us to prevail. But if you were to conclude that the appropriate remedy here were for USA Sales to get a refund from the federal taxpayer, then that would sustain this Court's judgment alone, and you wouldn't need to get into the statutory issue. Well, I'm just saying that the Supreme Court said the law is unconstitutional. We all can agree with that, correct? The Supreme Court said that the disuniformity in the law was unconstitutional, but it did not outline about what you do with that. No, I understand. Two different questions. But the law itself is unconstitutional. If the law is unconstitutional, why do we need to spend our time talking about whether it applies to a particular case if the law is unconstitutional? Well, I agree with Your Honor that the crux of this Court's focus should be on the constitutional remedy question, a sign of things here, rather than on the statutory question. But the only reason I ask is because in your brief, that was the lead argument. Is the opposite true? If we were to find that Congress never intended for this to be paid, would we have to reach the constitutional issue? That's right. If you agree with the district court here, and the reason it was the lead argument in our brief is because the district court was very clear about what it thought was its principle holding and what it thought was its alternative holding. So it said its principle holding was that the statute just did not even apply to cases that were already pending as of January 2018. Yeah, yeah. Is it your view that we should follow the normal preference to decide non-constitutional issues before reaching constitutional ones if we don't need to reach them? You're welcome to do so. I mean, respectfully, we don't think that there's that much substance to the retroactivity side of things. Every other court of appeals that has addressed this issue has ruled in our favor. And every other court of appeals has also said that there's a refund available as a constitutional remedy. Well, yes, there are two courts of appeals that have said that so far, but neither of them have actually given any reasoning that we consider in any way sufficient for us to justify paying hundreds of millions of dollars in taxpayer funds to people. And we're waiting to hear from the 11th Circuit. The case is also pending before the 4th Circuit on a petition for direct appeal. Those two circuits have the VA districts in them. So at this point, yes, the 2nd and the 10th Circuit simply reinstated what they had done before Siegel. The 2nd Circuit didn't give any reasoning at all about remedy. And the 10th Circuit said, we take the government's point that congressional intent should be relevant, but we just think us, we sitting here in Denver, can't do anything about Alabama or North Carolina. And respectfully, as a matter of substantive constitutional law, that's not the analysis to perform. The analysis to perform is... Where's the authority to retroactively increase payments already made in the administrator districts? Sort of the leveling up or down, whichever way you want to look at it, to make it equal. First of all, we don't think you even need to get there because we consider it sufficient that Congress has fixed the structural problem going forward. The Supreme Court didn't go back in Morales-Santana and claw citizenship away from people who shouldn't have gotten it. It didn't go back in Barr v. AAPC and adjust the liability of people who were found, you know, liable for conducting impermissible robocalls under that statute. We think that here it's enough to let matters lie in the past. You don't need to revisit past transactions. It is enough to correct the structural problem going forward, and that is what Congress did here. And we don't think that this debtor gets any additional bounty on top of what has already happened during the penancy of litigation. Now, I understand that if you disagree with me on that, there's a second question. If you do have to go back and reopen the past, if you operate on the 2,000-odd debtors in the 88 districts or you operate on the 60-odd debtors in the 86 VA districts, and that question turns solely on congressional intent, under Morales-Santana, you look to what the Congress that enacted that law would have preferred to do. Would they have preferred for the general rule to govern everyone? One step for the tiny favorable exception, which the Supreme Court in Segal said hadn't even been intended by Congress. How would we do that? I mean, we're a big circuit, but we're not that big. How would we make people in Alabama pay more money or people in North Carolina pay more money? You wouldn't, and you don't have to, because the job of the court in this case is to decide whether this debtor, as a matter of substantive constitutional law, is entitled to the remedy that this debtor seeks. And if this court concludes that the right defendants aren't before you or this court isn't the right forum to order this relief, that doesn't mean that he then gets something else that's improper as a matter of congressional intent. As I mentioned, the 4th and 11th Circuits, in which the VA districts are apart, have this matter before them. If the Solicitor General seeks certiorari from the 2nd or 10th Circuit decisions, this matter will be in the Supreme Court. One way or another, as a matter of precedent or direct action by the relevant circuits, this can get fixed in the right forum. But the right answer can't be that every debtor everywhere around the country has to get a refund, because it's not possible for every court around the country to order the systemic relief that's necessary to solve this problem. You have to start with just first principles. Would Congress intend for the remedy to lie in nullifying the 2017 Act and forcing taxpayers to pay up to $300 million? Remember, the whole point of the 2017 Act was to make sure that taxpayers wouldn't bear this burden. Or would Congress intend for refunds, knowing that there may be practical problems in some cases with acting on past cases? We think it is clear-cut that Congress would prefer a solution. Congress didn't say that in the 2020 Act, did it? It didn't. At that time, Congress didn't even think what it had done was unconstitutional. It thought that what happened was just a practical problem in the implementation of its statute, because, as the Supreme Court said in footnote 2 of Siegel, Congress actually expected in 2017 that the fee increase would go into place nationwide. The Judicial Conference had a standing order, in effect, requiring equal fees, and past fee increases had been implemented in lockstep. So, you know, we lost at the end of the day in Siegel, but along the way to losing, the Supreme Court said, yeah, actually, government, you're right. And the Eleventh Circuit and its Mosaic opinion was right. That Congress expected the fee increase to go in place nationwide. It just used the word may rather than shall, and that was a defect in the statute. So we take that that technical violation happened, but as a matter of remedy, you have to look to what the Congress in 2017 would have intended. And I understand that if you think some retrospective action is required, that, you know, either way it's going to be difficult, frankly, because you're going to have cases that are closed, debtors that are no longer in business. You're not going to achieve practical uniformity either on the refund side or the additional collection side down to every last debtor. All you can do is a good faith effort. In our view, it is far simpler for the bankruptcy administrators, as a matter of Supreme Court precedent, again, or direct order from the Fourth or Eleventh Circuits, to act on whatever debtors they can act on reasonably consistent with constitutional safeguards in those 60-odd cases in Alabama and North Carolina, than it is for us to be issuing refunds on thousands of cases that cut directly against Congress's intent in passing the statute at issue. I understand there's also a class action. That's right. There's a class action pending in the Court of Federal Claims. It's an odd procedure there. It's an opt-in class action. So you have to send back a form saying you agree to participate. But the government's, you know, liability for fees here is perhaps most substantial in that class action because there we're talking not just about the $600,000 that my opposing colleague's client would like back, but potentially upwards of $326 million to others. But there has been no, in terms of, we have all these trains racing down the track right now, right? We have the 11th Circuit, we have that case, we have this case, the federal claims case. Do you know where we are on that one? Yes, that was remanded to the Court of Federal Claims. The plaintiff there moved for summary judgment in its favor, but has since asked to defer that motion pending a motion for class certification. So it's not right for appellate consideration there. At this point, what we as the government are really looking for is the answer to the question. And if the 2nd and the 10th Circuits and other circuits had just told us with reasoning, you know, why we should have to lose, we would take that very seriously. But at this point, with $300 million on the stake and no court actually explaining why we should lose, like we are continuing to ask for rulings to be issued on this. And we're hoping that even if a cert petition is filed, that the 11th Circuit or perhaps this court would issue a reasoned decision that would help inform the Supreme Court's judgment whether to take up this matter. You know, if there's a circuit split or, you know, our judgment about whether to continue to pursue these views. Because we would have thought that the Supreme Court in Siegel was going to decide this issue. Most of the oral argument in Siegel was about this issue. Justice Kavanaugh and Justice Sotomayor expressed serious concerns about why there should be any refunds entered in these cases. So it was, you know, somewhat disappointing that they ended up kicking the case back down to the lower circuits. And it's been especially disappointing when the 2nd and the 10th Circuits didn't say anything additional beyond what they had already said, given that the Supreme Court had expected further consideration of the question. So I just want to be clear here. You want us to do nothing, issue no remedy based on the presumed intent of Congress in 2017 and 2020. Am I correct? It's appropriate for you to declare that my opposing colleague's client had, you know, was right on the law. They were right that the law was unconstitutional. And there was a defect there. Congress should have said shall instead of may. But we don't think they're entitled to anything. And if Congress hadn't fixed the problem, this court could have affirmed an order of the district court saying that Congress needs to fix that problem. That's what this court did in Victoria Farms before, when there was a discrepancy between U.S. trustee districts and VA districts. At that time, the problem was that the courts in the VA districts couldn't even collect the fees. They didn't have the authority to do it. This court recognized in Victoria Farms that the remedy wasn't to stop collecting fees in the 88 other districts. It was to require Alabama and North Carolina debtors to start paying quarterly fees too. And obviously, you know, Judge Reinhart's opinion in that case didn't immediately bind Alabama and North Carolina courts, but it did kick the ball to Congress, which then fixed the problem in the way it wanted to. And we think much the same course is appropriate here. We wouldn't say that you need to require the VA districts to join the U.S. trustee program, which is what I think Victoria Farms had contemplated. But we would say, you know, you would say, okay, you know, you've got to fix this going forward. And here, Congress has already done that during the pendency of litigation and did it at a time when it didn't even know that there was a constitutional problem yet. But having fixed the problem, I mean, equity principles tell courts that in fashioning constitutional relief, it makes eminent sense to look to what Congress has done if they have done anything. And here, you know, Congress didn't seem to contemplate that we should upset settled payment transactions in the past. We should just fix the problem going forward. In terms of other circuits ruling against us, I do want to make sure that you've taken a look at Judge Brasher's concurrence in the 11th Circuit, which we're waiting for a fresh 11th Circuit decision on GDR. But even before Siegel, Judge Brasher correctly anticipated the Supreme Court's ruling that the law was unconstitutional, but then went on to say at length why that didn't entitle anyone to a refund remedy. And his analysis is far more thorough than anything the 2nd or the 10th Circuits have said. And so we're very much hoping that the 11th Circuit will, again, say something similar to what Judge Brasher had said before. There have been a couple bankruptcy court decisions, which I understand are not appellate, but there was one just from a couple weeks ago in the VG liquidation case. Do you want to comment on those cases because they provide some more analysis? Yes, the VG liquidation case and the Siegel case itself on remand back before the bankruptcy court. Those two courts said that they thought that the inquiry into congressional intent was a wash. That was the term they used, and we just do not see it that way. It is so clear that the Congress in 2017 that was increasing fees to relieve burdens on taxpayers would have intended the fees to go in place nationwide because that's actually what they expected would happen as an empirical matter. And they also relied on concerns about the fact that they themselves, sitting in their respective cities, in, you know, Wilmington, Delaware, or whatever, couldn't enjoin action in Alabama and North Carolina. But for reasons we've already discussed, that just as a matter of substantive constitutional law, you have to figure out what the right answer would be, and then you move on to is this court the right forum to provide it, or is it some other court? It's a systemic problem that needs one systemic fix. Not every court is going to be the right court to do it. But you can't just avoid that problem by deciding that you're going to, you know, issue a refund remedy that seems to be within your power but is contrary to the substantive constitutional rule that governs this case. And I see that I have one minute left on my clock. I don't know that I still have that for rebuttal. I guess we'll do this. Why don't you go ahead and take a break? We'll give them three minutes for rebuttal. Thank you. We'll round up a little bit. Good morning, and may it please the Court. My name is LeVar Taylor. I'm here on behalf of the Appellee USA Sales. The first thing I would like to do is address Your Honor's question that you asked. Why does it make a difference? Why do we need to address this statutory question? I think that's a good question. If you look at the U.S. Trustee's brief, they raise this issue in the constitutional discussion, the constitutional remedy discussion, and they say, well, you don't get, they suggest, you don't get a post-payment remedy. We don't have to give you one without ever discussing whether Congress prohibited a post-petition remedy. They don't make that argument in the statutory case, which is utterly bizarre to me, because what they've essentially said is we concede that if we lose the statutory issue, there's authority to issue a refund. So that argument that says, well, wait, you don't have a post-payment remedy, wasn't made in the first part of the brief. It was made only in the constitutional section. And so if this Court says we think the statute says what we advocate for, there's no issue about whether to issue the check. What text do you rely on in the 2017 act to demonstrate that it is not intended to apply to pending cases? Well, the text does not address it. It says all disbursements, but it doesn't say all disbursements in what cases. So the analysis of a little more. Well, all usually means all, doesn't it? Well, I understand the Court's comment, but if you look at the history of the legislation of 1938-6, you find that prior to this 2017 legislation there was a dispute about whether a change to 1938-6 was intended to apply to all pending cases. And so that dispute ultimately was resolved by Congress when they said we're passing a law, we're making it very clear that it's to apply to all pending cases. So Congress knew how to do that. They did not do that here. Moreover, they did not do that, they did do that in another section of the 2017 legislation, the section that amended 1221 of the Bankruptcy Code. They explicitly said in the 2017 legislation that we're going to apply this to all cases, pending cases. So, and then in the 2021 legislation, Congress used the very same specific language for applying this to all pending cases. So our analysis is that this language doesn't make it clear. So when it doesn't make it clear, you go look at the lands graph. And what does the lands graph say? Well, you look at that and you say, does this change things retroactively? Now I'd like to talk about that for a second, because why did my client have to pay these fees? My client had to pay these fees because they filed Chapter 11 back in 2016. If my client hadn't filed the Chapter 11 in 2016, then disbursements in later years don't mean anything. So the very reason why my client had to pay these fees was a decision made back in 2016, and that's why this is retroactive. It affects my client based on a decision. And in fact, when you read through and look at the history of the case, my client, the fees went from $50,000 a year to $350,000 a year, and my client went from a profitable company to a non-profitable company. The facts of this case are kind of a poster child for what happens when it's not clear in the statute. I mean, that's our first argument, it's not clear. Well, the fact that there was a difficulty experienced by your client can't be the answer, because if Congress had said, clearly this applies to all pending cases and it includes Schell and Zorn, they still would have been subject to the larger fee. So just the fact that it was onerous doesn't, to me, seem analytically to help us out. I don't disagree with Your Honor. The fact is, again, the fact that the legislation did not explicitly state that it applies to all pending cases, that you have to go there first before you get to the Lyons-Graf analysis, because Lyons-Graf says, hey, we acknowledge that Congress can explicitly make it retroactive. Now, that may be subject to constitutional limitations, but they do say that Lyons-Graf looks and says, well, is this retroactive? It clearly is retroactive in this case, and so now we have this presumption against retroactivity that kicks in. And we look at the statute, and the statute doesn't say this applies to all pending cases. And so now we look at what's the effect on my client. The effect is draconian. The only reason my client lived was because they cannibalized their inauthority in the tune of half a million dollars to fund the fees. If you have a look, when we were before the court, we introduced all the U.S. trustees, the monthly operating reports, and it showed the only reason my client could stay alive in the Chapter 11 was because they sold off excess inventory from $2 million to $1.5 million. And then we were able to negotiate a deal with all the creditors. So the reason this is retroactive is that we use the analogy of the toll road in our brief. When my client made the decision to go into bankruptcy, my client could not get out of bankruptcy just willy-nilly. It's not the case where, like, when you go buy a piece of property, oh, they increase the property taxes. And so you could sell the property. That's not my client's fact pattern. They were not free to get out of bankruptcy. They had to get permission from the court. And so if they had chosen not to pay those fees, the local U.S. trustees office would have come into motion to dismiss the case or convert the case to Chapter 7. My client, you know, if it was dismissed or converted because of the unique facts, without all the deal that we reached with all the creditors, my client would have been out of business. So this is clearly retroactive in effect. And, of course, if you disagree with me that the language is not clear, you don't have to go there. But if you look at the history of the amendments to 1938-6, Congress said both before and after this legislation that they said, oh, we're going to apply this to all pending cases. And they said it in another section of the 2017 legislation. So I can lie on the remedy issue. Congress clearly intended these fees to be paid. And though there's much dispute about that, the method in which they accomplished that was problematic, as we all know. So why should there be a remedy at this point in time? Give us an argument for why the remedy of refund is available to you. Because the Supreme Court has consistently held in tax cases, I'm a tax litigator, it's done in tax cases that where there's an unconstitutional tax imposed, the state has to give a remedy to get it back. You're talking about money. So the cases cited by the U.S. Trustee's Office that say, well, they didn't, you know, we're just going to look forward. They're generally cases dealing with things like, you know, benefits under immigration laws. Here we're talking about money. But counsel, if it were that clear, why did Siegel leave it open with a paragraph that said, there are all these myriad difficult issues that come into play in answering the question? Well, the argument, I think the Supreme, I can't speak for the Supreme Court personally. Well, I guess why is the wrong question. But it seemed to me that it signaled that this is not an obvious, this issue does not have an obvious answer is what I read into that paragraph. Well, based on the record that was before the court, the court didn't have. So, for example, you know, there's issues about practicality of remedies. There's no way that the remedy, you know, there has to be one or two remedies from our standpoint. Okay. Consistent with the intent of Congress and consistent with the Constitution. So. One is to grant refunds and the other is to require the other handful of districts to pay up. Right. And that's correct. And this court doesn't. And neither of those would be constitutional under the uniformity clause, correct? We don't think that the remedy urged by the U.S. trustees would be constitutional because you have a bunch of cases that are out there where everything's done. Well, that's not my question because there may be cases in which refunds are not available either. Would it be constitutional under the remedies clause to require everyone to pay the additional amount, as distinct from everyone who's available getting a refund? In either case, it appears to me that it would be uniform rather than non-uniform. Is that not so? Yes, but that would potentially correct the uniformity problem. But you have to do so in a constitutionally correct manner. First, I'd like to comment. Your Honor made a comment, well, there might be cases where there's no refunds. Well, it's decided by the district court. Congress passed a law saying, hey, look, we realize that refunds can be paid. So I don't think there's a universe where there's no refund available to anybody who asks for one. We don't know how many people are going to ask for one. But we do know that the six-year statute's limitations under 828 U.S.C. 2401, which is the general six-year statute limitations for suing the government, it's going to start kicking in in 2024, and it's going to kick in on a rolling forward basis as each quarter passes. But to get to Your Honor's question of can the courts constitutionally authorize an increase in the B.A. districts for purposes of creating uniformity, that, I think, is Your Honor's question. Well, not authorize it, but simply say that that was what Congress meant, and Congress would not have intended for the vast majority. In other words, they wouldn't have intended for the tail to wag the dog. Our position is, even if Congress intended that, it's not constitutional, because you have all these confirmed Chapter 11 plans. We're years into the future now. And to require uniformity by going back and charging increase in all the fees in all these cases that are done, over, dismissed, converted, gone, would upset, you know, it would violate due process. So Congress, the congressional intent has to be consistent with the, you know, with the Constitution. And in tax cases where you're dealing with uniformity, okay, the same type of uniformity that we're dealing with in the Bankruptcy Uniformity Clause, the Supreme Court has said states must give the, oh, yeah, you have to give them an opportunity to equalize, and the preference, if you look at the case law side in our brief, the overwhelming preference has been to allow them to create a refund. In fact, there's a whole series of cases discussed in our brief about how they have to allow them to give a refund, which goes into the argument made in the U.S. Trustee's brief, is that, well, we don't think you're entitled to a post-payment remedy, even though the statute doesn't say that, even though there's no guidance from anywhere that says that, even though the U.S. Trustee's office has never told anybody that that's the case before raising it in the briefs in these cases. So you look at the tax cases, the overwhelming preference is when there's a lack of uniformity. Issue the refund. I assume this issue is directly raised in the case that, where there's class certification petition pending. Is that correct? I'm not sure. I can't answer that question. Maybe counsel can answer that question. If this panel has any other questions. Thank you, counsel. Thank you. I'm glad my opposing colleague brought up the tax cases because it helps make an important point. The remedy for the uniformity clause violation, the bankruptcy uniformity clause violation, does not require a backward-looking remedy. That's the general constitutional rule. However, the Supreme Court said in Harper and McKesson that the Due Process Clause requires a backward-looking remedy if a person didn't have a chance to litigate their constitutional claim before they had to pay. If you had to pay under protest, then the Due Process Clause, rather than the Equal Protection Clause, the First Amendment, whatever other substantive source of constitutional authority, the Due Process Clause requires retrospective relief. And that retrospective relief can take the form either of additional collections from the people who underpaid or refunds to the people who overpaid. We don't think that this case falls within that Due Process Clause exception because U.S. ACLs had the ability, just as the debtor in the Gibbons case, the other case in which the Supreme Court held something unconstitutional in the uniformity clause. The debtor there, rather than paying the money first, said, I want a preliminary injunction against having to pay this because I think it's unconstitutional. And some of the other debtors around the country worked out an escrow arrangement to pay the funds into a court account during the pendency of the dispute. Some debtors just stopped paying quarterly fees during the pendency of this. We didn't move to dismiss those cases. U.S. ACLs here had an opportunity, just like other debtors around the country, to dispute this on the front end, but they didn't. And so the Due Process Clause does not require a refund here. They pointed out that as a statutory matter, we pay refunds, and that's right, and that's entirely consistent with our argument. In fact, U.S. ACLs itself overpaid as a matter of statute, and we promptly refunded them the money that they overpaid. That's because the question, we think, you get a refund there but not here because it's what Congress would have intended. What Congress wrote down in the statute is what Congress intended. So if they pay too much, we refund them. In our view, the 2017 Act is what Congress intended for everyone, and so they don't get a refund remedy here because that's not what Congress wanted. I read in your brief that you're suggesting that we order or suggest, I'm not sure what the language would be, that there be a good-faith effort to recover money from the debtors in the administrative districts. What is such a good-faith effort? I think that that would be a matter for further briefing once we recognize that the right rule is to increase collections there, but certainly to the extent that cases are still pending and corporate entities. McKesson itself contemplates that. We have authority to say that, though. I mean, it seems to me that even accepting your argument, our authority is limited to saying there's no refund available for whatever reasons. End of opinion. I don't see how we can give advice to the executive branch on how to do things next. Right, or the judicial branch, which is what operates in Alabama and North Carolina. You're right. I take it from Judge Tuneheim's question that he's concerned that he wants to know that there actually would be a remedy that some court somewhere could implement, and I want to give you the assurance that, yes, indeed, if the Supreme Court says or the Fourth and Eleventh Circuits say that the right answer is for the bankruptcy administrators to collect more, those bankruptcy administrators are going to follow the law, right? They're bound by Supreme Court precedent just like the executive branch is, and they can act in those cases that are still open or which a corporate entity still exists. We know from McKesson that if it's impossible to get at certain debtors, that's fine. All you need is a good faith effort. But to your point, Judge Graber, yes, it's not this court's job to direct that remedy. It's just this court's job to recognize if the right answer, level up or level down, and if the right answer is not to issue a refund here, you can stop there, and you can say whatever you want about the fact that you contemplate that a remedy would be available elsewhere, but ultimately that's the Supreme Court or a court with the right jurisdiction can impose that remedy if indeed it is required. I just have a question for you, Counsel, that the Supreme Court has said many times that, you know, the principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor. What you're proposing, the level up, how is that providing a fresh start to people whose bankruptcies have been closed maybe for four or five years? It was starting to do additional collections if that was required. For bankruptcies that have been closed potentially for four or five years, or maybe were initiated in 2012. Well, I have a few responses to that. One is that the Judicial Conference of Standing Order at that time had already required the increased fees to go into effect, so we don't think actually that the debtors in Alabama and North Carolina had any sort of vested legal right to pay less. We think it was a mistake that they didn't pay more, and so it's not. I mean, yes, it's a practical matter. You would be going back and adjusting stuff that they didn't see coming, but it just follows as a matter of constitutional law and McKesson that the right answer here isn't refunds. If you think you need to go back at all, and again, we really don't think you need to go back and do anything in the past, but if you do need to go back, you would act on whatever debtors you could act on there. And that's the second point that I wanted to make. If I could briefly address just the toll road analogy. I think the right analogy there is USA Sales sets up its cigarette warehouse next to a road in California that somehow becomes a freeway. That becomes a toll road. I know you don't really like toll roads out here, but let's just say overnight their cigarette warehouse, having been built, is now on a toll road, and they're arguing they shouldn't have to pay the tolls on that because they made a business decision to locate their distribution here. I mean, obviously it unsettles your expectations grounded in past projections to increase fees along the way, and I take all right. I remember my other point now, Your Honor, which is, yes, it is a hardship on debtors who are already in dire financial straits to have to pay quarterly fees. We would much prefer a system in which Congress just funds us straight through appropriations and we don't have to go around dunning people for fees, but we recognize Congress's authority as a policy matter to choose to do this through user fees and to do it on people who are already in financial distress who are in bankruptcy, and they haven't argued on appeal that Congress lacks the constitutional ability to set up a user fee regime. So I think we have to take our guidance from Congress that this is how they prefer to set things up. I have one more question, if I may. Of course, Judge Owens. I wanted to follow up on what Judge Tunheim had asked the opposing counsel earlier, and that is whether these issues are set up elsewhere, and I guess what follows for me is a question of whether we should, for some reason, wait for some other jurisdiction to decide that has, you know, greater authority over the other districts. I didn't express that very well. I think you have a point. I understand that. Just a minute, Your Honor. So the court that's most poised to rule is the Eleventh Circuit, in which I presented our argument on these issues back in February, and we'd hoped for a quick ruling from them. It hasn't come down yet, but it could come any day. The Court of Federal Claims case, there's a motion to dismiss that we have filed, and that case saying we think that they haven't stated a claim for an illegal exaction because no money was improperly taken from them because the right remedy for the violation is not to give them a refund. But that motion may now be withdrawn. That trial court is not poised to rule any time soon, it seems. And then in the Fourth Circuit, we have a petition for direct appeal pending that still hasn't been acted on, and that would still need to be briefed and argued. And so at this point, you know, we would welcome guidance from any court that's prepared to rule on it. The Supreme Court, I think, would welcome hearing from, since it GR'd in all these cases and sent them back down instead of deciding it in the first instance, I think would like to see decisions from folks at your level. And we think whether the Supreme Court grants it may ultimately depend on what it hears from the different circuits. And so we would urge that you rule on the issue. And just on the issue of whether you have to reach the statutory issue, Judge Rowe, to answer your first question, I think you do, because once you recognize that the uniformity violation is remedied by applying the statute to everyone, then the statute, as reformed to be constitutional, applies to everyone. And then you have to figure out, okay, well, does it apply to, let's say, sales, or are they exempted as a pending case? So I think if you agree with us on uniformity, you unfortunately have to reach the statutory issue. All right, thank you very much, Jensen. Thank you both for your briefing and arguing this case. As a parent who's been driving kids to basketball tournaments in Los Angeles and Orange County for the last eight years, I'm very familiar with toll roads, especially the 73. The 73 toll road, which has gotten more and more expensive over the years. I will not be taking a refund, but thank you. So we'll go ahead and call the next matter.
judges: GRABER, OWENS, Tunheim